IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) No. 3:07-CR-158 |
| | ) (Phillips / Guyton) |
| DONTAE PAUL SMITH, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This matter is before the Court pursuant to defendant Dontae Paul Smith's ("Smith") Motion to Suppress Evidence [Doc. 14]. Smith asks the Court to suppress all evidence seized, and all statements made by him, following the seizure and search of his person and a vehicle he was driving on May 11, 2006. For the reasons set forth herein, this Court respectfully recommends that the Motion to Suppress Evidence [Doc. 14] be granted.

**I: PROCEDURAL HISTORY**

On April 15, 2008, this Court conducted an evidentiary hearing on the merits of Smith's Motion to Suppress Evidence [Doc. 14]. Smith was present with his attorneys, Jonathan Moffatt and Ronald Newcomb. Assistant United States Attorney Cynthia Davidson represented the government. The Court received testimony from three witnesses, photographs of the area where the events took place and two in-cruiser camera recordings. At the conclusion of the evidence, the Court granted

1

the parties' request for leave to file post-hearing briefs after a reasonable period of time to review the record. A transcript of those proceedings has been filed as [Doc. 22]. On May 14, 2008, Mr. Smith submitted a Post-Suppression Hearing Brief [Doc. 25] in support of his position. On the same date, the United States filed a Post-Hearing Response to Defendant's Motion to Suppress Evidence [Doc. 26]. On May 21, 2008, Smith replied to the government's submission, [Doc. 27]. After a careful consideration of the record and the arguments of the parties, the Court concluded that it could not reach a reliable recommendation to the district court without additional information and asked the parties to address certain issues set forth in a list. [Doc. 28]. To this end, the defendant filed a supplemental brief on July 14, 2008, [Doc. 31]; and the United States filed a supplemental brief the following day, [Doc. 32]. On July 28, 2008, the Court heard oral argument and took this matter under advisement.

## II: FACTS

At the evidentiary hearing, the United States called three witnesses: Knoxville Police Department officers Greg Coker ("Coker") and John Mays ("Mays"); and Austin-East High School Assistant Principal Amos Whitehead ("Whitehead"). The facts are largely undisputed and were established as follows.

Austin-East High School is located on Martin Luther King, Jr. Boulevard, a busy thoroughfare. Behind the school building are a baseball diamond and a football field, along with parking lots for students and school staff. [Tr. 28]. The school is bordered by Hembree Street to the west, Tarleton to the east and Wilson Avenue at the rear of the grounds, beyond the sports fields. [Tr. 28 - 29]. The area to the sides and rear of the school is a residential neighborhood with houses for a number of blocks in all directions. [Tr. 28-29]. Students are released from the back of the

2

school building at the end of the school day, 3:25 p.m., and school buses wait there for riders. [Tr. 17-18].    On May 11, 2006, Coker was on duty as the School Resource Officer at Austin-East High School. Near the end of the school day, he was in a classroom at the rear of the school building. At a few minutes after 3:00, Whitehead called Coker on the school's portable radio system to report that Whitehead had just heard "shots fired" as he was leaving the school grounds. [Tr. 8, 17]. Specifically, Coker testified that Whitehead reported, "as he was leaving school, he heard shots fired in the area of the hill, going up the hill on Hembree Street adjacent to the school." [Tr. 8].

Coker walked to the back of the classroom and out a rear door, then looked in the direction of Hembree Street. He could see the area where Whitehead said the shots came from. [Tr. 9]. Coker saw a red four-door car parked on Hembree Street with people standing around it. It was the only car that had people around it. [Tr. 12]. Coker called the police dispatcher with the report of shots fired and asked for assistance from patrol units in the area, directing them to the red car. [Tr. 12]. At the hearing, Coker described this as an "emergency situation" since the school was about to let out, and because the shots were reported to have been fired in the direction behind the school, where the students would be exiting the school building. [Tr. 18].

Coker maintained his vantage point at the back of the school building, looking up toward Hembree, until he saw two police cruisers arriving near the red car, then he walked up toward them. [Tr. 12, 19]. As he did so, Coker first noticed a blue car also on Hembree. Coker testified that:

> If you see the fence right there [indicating a photograph exhibit] and you actually look to the left, there is an area right there that I really didn't pay attention to because although there were vehicles up there, I saw no activity. From where I was, I couldn't see into vehicles. Basically, what drew my attention to the area other than the report from Mr. Whitehead was I had people standing outside. That is the only thing that drew me to that particular spot. As the patrol vehicles came up, I see [sic] another vehicle start to leave the area.

3

[Tr. 13]

Smith was driving this second, blue car that "started to leave the area" and "moved from one side of Hembree to the other." [Tr. 14]; [Tr. 42]. Coker testified that the patrol cars did not actually stop the blue car, rather "that vehicle pulled over just prior to them actually getting there and getting stopped." [Tr. 13] Coker also testified that Smith "stopped prior to the officers actually pulling in and getting stopped." [Tr. 15]. Coker did not hear the reported shots nor did he see anyone shoot a gun. [Tr. 16].

Upon arrival, the regular patrol officers began to "secure the scene." [Tr. 19]. The in-cruiser cameras for the patrol cars operated by McAlister and Mays show that the first patrol car on the scene was McAlister's. As he drove directly up the center of Hembree, the blue car is seen to the right, at a stop partially in an unpaved pull-off in front of a house. The videotapes, Exhibit 1 and Exhibit 2, show the following relevant events. The officers walked up to the group of people, who were alighting from their cars in an ordinary manner under the circumstances. The police began by giving them oral commands. The first words of the police to Smith were McAlister's, "put your hands on top of your head for me, alright." Smith is then ordered to put his hands up, keep his hands up and put them onto a nearby van, then Smith was frisked by one of the officers. When a nearby man asked what was "going on here," McAlister told him they would let him know in a minute. During the course of the pat down, the police told the people from the blue car, including Smith, that there had been a report of shots fired. As Smith sat on the ground next to the van, as ordered by the police, the officers began the search of the blue car. There were no intervening events and the government does not argue that anything occurred during this period that would have added to the information known to the officers about Smith, the blue car, or the shots fired report.

4

Coker found ammunition in the glove compartment of the blue car and returned to Smith and frisked him again. Smith made at least one incriminating statement after the ammunition was found, to the effect that he did possess the bullets, but that he did not have a gun. Exhibit 2; and [Tr. 39]. Resuming his search of the blue car, Coker next found two guns inside the passenger compartment. [Tr. 39]. During this time, another officer made a local records check and determined there was an outstanding warrant for Smith's arrest for a state driving offense. As events progressed, Smith was later advised of his <u>Miranda</u> rights and gave another incriminating statement to police. [Tr. 63].

### III. ARGUMENTS OF THE PARTIES

The Court will not endeavor to restate each of the well-developed arguments and authorities presented by the parties, but will set forth a summary of their positions as a context for the Court's analysis and recommendation. The defendant's motion states that the police lacked probable cause to detain or otherwise seize him, to search his person or to search the subject vehicle. [Doc. 14]. The defendant's post-hearing brief argues that Smith was illegally seized following a response to a "shots fired" call where officers had no reasonable suspicion for an investigative detention. Smith asserts that the pat down of his person and the search of the blue car he had just exited were both in violation of his constitutional rights because there was no specific indication that he was engaged in any criminal activity. [Doc. 25]. Finally, the defendant argues that his statements to officers were made in response to questioning that was in violation of <u>Miranda</u>.

The government's position is that, under all the circumstances, the police officers who seized Smith had reasonable suspicion to believe that criminal activity may be afoot. Further, since this was a "shots fired" call, concerns for the officers' safety justified a pat down of Smith as they searched his car for firearms. The government asserts that the totality of the circumstances

supported the officers' belief that Smith might be armed and dangerous and this reasonable belief justified their decision to pat Smith down for weapons. Further, the government argues that after performing a lawful <u>Terry</u> frisk, the police lawfully searched the interior of Smith's vehicle for weapons. [Doc. 15]. Finally, the government argues that Smith's statements (made twice) that he knew there was ammunition in the vehicle came before he was in custody and again after he had been formally arrested on the outstanding warrant and given <u>Miranda</u> warnings. [Doc. 26].

At the request of the Court, the parties submitted supplemental memoranda addressing specifically certain aspects of the issues before the Court. [Doc. 28]. Counsel presented final oral argument on July 28, 2008. During this phase of inquiry, the parties clarified their respective positions, part of which are summarized as follows.

The government argued that four distinct facts justified reasonable suspicion: (1) the report of shots fired in "the immediate area" where Smith was found, which is a "high crime area"; (2) school was in session; (3) the people in the red car and the people in the blue car were the only people in the area; and (4) the defendant's movement of his car. The government characterizes this last factor as an "evasive action" taken by Smith as he drove the blue car. The government argues that it demonstrated an effort by Smith to "blend in with the other people" nearby and divert attention away from himself. The government agreed that the search of the blue car would not have been proper unless the initial pat down of Smith's person was justified.

Smith presented two arguments in response. First, Smith asserted that there was no testimony at the evidentiary hearing that this was a "high crime area", nor does the record indicate that, at the time of the seizure, the police officers considered the driving action of the blue car in formulating a reasonable suspicion about Smith. The defendant also argued that Mays testified that

he could see movement of the blue car on a videotape as it was played in court, but did not indicate he had observed anything of this nature at the time. While Coker testified that he saw the driving movement from his vantage point down the hill at the school, this was not communicated to the officers who initiated the seizure. Second, Smith argued that even if the officers on Hembree Street saw the blue car drive a short distance, then pull to the side of the street, this was not an evasive action. Smith pulled to the curb and got out of his car. There is no evidence that he appeared nervous or tried to flee the area, rather, he was just one of the several people stopped by the police, with no specific suspicion attached to him. The defendant argued that there was nothing particular about Smith, his car or even that precise location in connection with the report of shots being fired which would justify the detention of Smith.

## IV. ANALYSIS

    A.        Terry Stop and Frisk

The Fourth Amendment prohibits searches and seizures by the government that are unreasonable, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. Terry v. Ohio, 392 U.S. 1, 9 (1968); United States v. Cortez, 449 U.S. 411, 417 (1981). Because the "balance between the public interest and the individual's right to personal security," tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity "may be afoot." United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975); United States v. Sokolow, 490 U.S. 1, 7 (1989); United States v. Cotton, 928 F.2d 405 (6th Cir.

1991).[1]

At the heart of this matter is the principle that "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." Terry, 392 U.S. at 30. The determination of reasonable suspicion is to be made "in light of the totality of the circumstances," Caruthers, 458 F.3d at 465, and requires the officers to "*have a particularized and objective basis* for suspecting the particular person stopped of criminal activity." United States v. Hurst, 228 F.3d 751, 757 (6th Cir. 2000)[emphasis added]. Although "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard," an officer's reliance on a mere " hunch" is insufficient to justify a stop. United States v. Arvizu, 534 U.S. 266, 274 (2002) (citing Terry, 392 U. S. at 27; and Sokolow, 490 U. S. at 7); United States v. Hurst, 228 F.3d 751, 757 (6th Cir.2000); Houston v. Clark County Sheriff Deputy John Does 1-5, 174 F.3d 809, 813 (6th Cir.1999).

In evaluating the totality of the circumstances, the Court must not consider each factor leading to the seizure individually; rather, the Court must examine the factors as a whole. See e.g., United States v. Sokolow, 490 U.S. 1, 8-9 (finding that although the facts may be consistent with innocence, all that is required to justify an investigatory stop is that the officer's suspicion be "reasonable" and "articulable" as determined by the totality of the circumstances) and Ellis, 497 F.3d at 614 ("A totality of the circumstances analysis prohibits us from discounting certain factors merely because, separately, they could potentially have 'an innocent explanation.'" (quoting Arvizu,

---

[1] The government does not dispute that a seizure occurred when the officers approached Smith and the others.

534 U.S. at 267)).

Within this framework, the Sixth Circuit recommends a two-part test to determine the legitimacy of an investigatory stop. See e.g., United States v. Luqman, 522 F.3d 613, 616 -617 (6th Cir. 2008); United States v. Davis, 430 F.3d 345 (6th Cir. 2005). First, the Court must determine if there was a proper basis to stop Smith based on the police officers' awareness of specific and articulable facts that give rise to reasonable suspicion. United States v. Bentley, 29 F.3d 1073, 1075 (6th Cir.1994); United States v. Garza, 10 F.3d 1241, 1245 (6th Cir.1993)). The Supreme Court recognizes "that the concept of reasonable suspicion is somewhat abstract." United States v. Arvizu, 534 U.S. 266, 274 (2002) citing Ornelas v. United States, 517 U.S. 690, 696 (1996) (principle of reasonable suspicion is not a "finely-tuned standard"); and United States v. Cortez, 449 U.S. 441, 417 (1981) (the cause "sufficient to authorize police to stop a person" is an "elusive concept"). The Sixth Circuit describes the line of cases addressing this inquiry as having "deliberately avoided reducing it to 'a neat set of legal rules,' " Ornelas, at 695-696 (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983).

The "totality of the circumstances" in Smith's case consists of the following pieces of information. First, the assistant principal had heard gunshots fired from the direction of Hembree Street as he drove around the back of the school yard. Hembree is a residential street bordering the school and lined on the oppose side by houses, with blocks of houses on residential streets extending behind it. These events occurred in the middle of the afternoon on a weekday; school was in session. About 15 to 20 seconds after the report, Coker looked in the direction of the shots and saw a red car parked on Hembree Street with people standing around it. Coker noticed no other people or cars of any note as he looked in the direction of the gunshots. Coker saw no guns or persons who appeared

9

to be shooting guns. Coker called for assistance from marked patrol cars, directing them to the red car on Hembree. When patrolmen arrived about two minutes later, they came upon the same red car in the same location and also encountered a blue car. The blue car was parked, but began to drive down Hembree toward the patrol cars as they approached, but stopped when the police cruisers pulled onto Hembree. The blue car stopped facing the wrong direction, parked at an awkward angle with the rear of the car well into the roadway, and two people got out in an unremarkable manner.[2] There were several people in and around the red and blue cars, which were parked alongside one another. No other people or activity were observed on Hembree Street.

In Terry v. Ohio, 392 U.S. 1, 88 (1968), the Supreme Court did not adopt a bright-line rule authorizing weapons frisks in all on-the-street confrontational encounters, "despite the obvious danger to police officers that inheres in these encounters." United States v. Johnson, 246 Fed. Appx. 982 (6th Cir. 2007); Terry, 392 at 27; see also Maryland v. Buie, 494 U.S. 325, 334 n. 2 (1990). The purpose of the limited Terry search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence. Adams v. Williams, 407 U.S. 143, 146 (1972). The Terry frisk or pat-down of that person for weapons requires first a lawful investigative detention, then a reasonable belief that the suspect is armed and dangerous. See Terry, 392 U.S. at 30; United States v. Strahan, 984 F.2d 155, 158 (6th Cir.1993).

"Fourth Amendment [was intended] to prevent situations such as those alleged here-officers, having no reason to fear for their safety, may not require citizens, whom they have not arrested, to

---

[2] There was testimony about a flimsy black item held or dropped by a female standing by the red car. The government asserted it was a black bandana associated with a street gang called the Burlington Boys. The defense argued it was a piece of window tinting material. The Court does not find that this detail contributed to the facts and circumstances taken into account by the police at the time of the seizure and search of Smith and the blue car.

stand up against gates or place their hands on police cars, and submit to searches. This has long been the law." Bennett v. City of Eastpointe, 410 F.3d 810, 841 (6th Cir.2005).

The Court finds that the facts of this case fail to satisfy the first prong of Terry scrutiny; the totality of the circumstances known to the officers falls short of a particularized and objective basis for suspecting criminal activity by Smith. The Court finds the seizure of the two cars and occupants was not based on specific and articulable facts connecting those persons, or even those cars, with discharge of a gun. See Ornelas v. United States, 517 U.S. 690, 693 (1996); United States v. Cortez, 449 U.S. 411, 417-18 (1981); Terry v. Ohio, 392 U.S. 1, 30 (1968). The only connection between Dontae Smith, as the driver of the blue car, and the suspected criminal activity was that Smith was physically present, along with several other people, on Hembree Street, after Whitehead reported Hembree Street as the general direction from which a gunshot was heard. The lack of individualized suspicion of wrongdoing is demonstrated when the Court considers that the same basis offered in support of the "stop and frisk" of Smith applied to all the persons on the scene, every person in or around the houses along Hembree and anyone who might be found in a car, house or yard for blocks in that direction. The gunshot report related no description of the offender's race, gender, age or physical description and no connection to any vehicle at all. The Court finds nothing evasive in Smith's driving behavior. Smith had just begun driving along the narrow street when two marked cruisers drove up the street toward him. From the two cruiser-camera videotapes, the Court observes that Mays and McAlister drove onto Hembree Street and approached the red car and the blue car parked near one another on what appears to be the second block of the narrow thoroughfare. Neither videotape gives a clear view of the driving action made by the blue car before the patrol cars pulled up facing head-to-head and blocking the street, although the Court does observe that McAlister's

video does, very briefly, show the blue car pulling to the side of the roadway. There was no evidence, on the videotapes or otherwise, that Smith attempted to flee the scene or avoid the police as they approached, no indication that Smith was seen with a gun or that he appeared nervous when the police arrived. To the contrary, both in-cruiser videotapes and their audio recordings show the entire group of people was calm and compliant with the officers' directives.

Aside from Smith's actual presence on Hembree Street, there was not a single fact known to the officers from which they could draw a reasonable suspicion that criminal activity was afoot or that Smith was engaged in criminal activity. The Court is challenged to imagine what *less* Smith could have been doing when police pulled up. Coker's subjective belief that Smith, or the blue car, or the red car, or some other person in the area, might be the source of the gunshot amounts to nothing more than an "inchoate and unparticularized suspicion or hunch of criminal activity," specifically rejected in Terry, 392 U.S. at 27. What is required is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." Cortez, 449 U.S. at 417. Reasonable suspicion requires a showing of "more than a mere hunch." Smoak v. Hall, 460 F.3d 768, 778 (6th Cir. 2006).

It is of no consequence to this analysis that the officers later found two guns in the blue car, as the reasonable suspicion inquiry considers only facts known to the officers *at the time of the detention.* United States v. Johnson, 246 Fed. Appx. 982 (6th Cir. 2007) [emphasis in original]; accord Terry, 392 U.S. at 21 (asking whether "the facts available to the officer at the moment of the seizure ... [would] warrant a man of reasonable caution in the belief that the action taken was appropriate"). Likewise, at the time of the initial seizure, the officers had no reason to suspect the outstanding arrest warrant for Smith.

12

B.  Exigent Circumstances

The government also argues that exigent circumstances existed which justified the officers' detention and search of Smith and the other persons, along with both cars, because these events took place near a school. The exigent circumstance of an imminent emergency is alternatively discussed as the "community caretaking function."

Exigent circumstances are situations where " 'real immediate and serious consequences' will 'certainly occur' if a police officer postpones action to obtain a warrant." Ewolski, 287 F.3d at 501 (quoting O'Brien, 23 F.3d at 997; and Welsh v. Wisconsin, 466 U.S. 740, 751 (1984)); accord, Thacker v. City of Columbus, 328 F.3d 244, 253 (6th Cir. 2003). The exigent circumstances exception relies on the premise that the existence of an emergency situation, demanding urgent police action, may excuse the failure to procure a search warrant. The Sixth Circuit has identified the emergency situations giving rise to the exigent circumstances exception to the warrant requirement as (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, or (4) a risk of danger to the police or others. See United States v. McClain, 430 F.3d 299, 304 (6th Cir.2005). "The government bears the burden of proving [that] exigent circumstances existed." Bates, 84 F.3d at 794. Here, the government urges that the risk of danger to police or others was so high as to constitute an emergency situation, which weighs in favor of the reasonableness of the search. This argument is without merit and application of this doctrine is not supported by Sixth Circuit jurisprudence on the facts in the instant case.

First, safety to police officers and persons nearby during the course of investigating suspected criminal activity is a fundamental rationale discussed extensively in Terry v. Ohio, and provided a significant basis for the "stop and frisk" approved by the Supreme Court. "The sole justification of

the search in the present situation is the protection of the police officer and others nearby, and it must therefor be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry, 392 U.S. at 29. Accordingly, typical danger to a police officer was already accounted for in the lowered standard required for a stop-and-frisk: reasonable suspicion as compared to probable cause. Danger to a police officer cannot then be weighed twice and serve to lower the Terry reasonable suspicion standard to something less.

Second, while the fact that the gunshots were heard by someone on school property is of some concern, there was no evidence at the hearing that Whitehead reported the sound was on the school grounds or in any way close to or associated with the school. By comparison, the facts which have justified application of the exigent circumstances doctrine have been far more urgent. For example, in Michigan v. Tyler, 436 U.S. 499 (1978) the Supreme Court upheld the seizure of plastic containers containing a flammable liquid discovered by a fire official on the premises of a burning building. In the course of their efforts to combat the blaze, the firefighters observed two plastic containers of flammable liquid inside the building, removed and later brought to the fire station for safekeeping. Tyler, 436 U.S. at 501-02; c.f., United States v. Williams, 354 F.3d 497 (6th Cir. 2003) (possibility of water leak in tenants' residence was not "risk of danger" exigency justifying warrantless entry by Drug Enforcement Administration agents). Of similar tone, in Cady v. Dombrowski, 413 U.S. 433 (1973) the Supreme Court concluded that Wisconsin police officers who had arrested a Chicago police officer for drunk driving did not violate the Fourth Amendment in searching the suspect's car for a firearm. Cady, 413 U.S. at 447. Noting that the arresting officers believed that Chicago police were required to carry a service revolver with them at all times, the Court concluded the search was

incident to the caretaking function of the local police to protect "the safety of the general public who might be endangered if an intruder removed a revolver from the trunk" of the 1967 Thunderbird which had been abandoned on the side of the roadway. Cady, 413 U.S. at 447.

Upon comparison, the Court finds no exigent circumstances in the present case that would support the detention and search of Smith and the other people in the area without particularized suspicion of criminal activity.

### V. CONCLUSION

The Court finds that the government has not established sufficient basis for the officers to detain and frisk Smith and search his vehicle. All evidence, either physical or in the form of an incriminating statement, must be suppressed. For the reasons stated herein, the Court's recommendation is that Defendant Dontae Smith's Motion to Suppress **[Doc. 14]** be **GRANTED**.[3]

                        Respectfully submitted,

                        s/ H. Bruce Guyton
                        United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).